

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 22, 2015**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In Re:** | § | |
| | § | **CASE NO. 13-34861-SGJ-7** |
| **GONZALO SALDANA,** | § | |
| **Debtor.** | § | |

### MEMORANDUM OPINION AND ORDER: (A) SUSTAINING IN PART AND OVERRULING IN PART TRUSTEE'S OBJECTIONS [DE ## 246 & 313][1] TO DEBTOR'S CLAIM OF RURAL HOMESTEAD EXEMPTION, AS AMENDED; AND (B) SHIFTING CERTAIN ATTORNEY'S FEES TO DEBTOR AND DEBTOR'S COUNSEL, PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE AND THE ORDER TO SHOW CAUSE [DE # 308]

### I. INTRODUCTION

This Memorandum Opinion and Order is issued in a contested matter involving a Chapter

7 Debtor with hundreds of acres of real property who—very late in his bankruptcy case—

---

[1] Estela Saldana ("Estela"), the largest claimant in the above-referenced bankruptcy case, also filed a Joinder in the Trustee's Original Objection to Exemptions. *See* DE # 264 in the Bankruptcy Case. References to "DE # __ in the Bankruptcy Case" herein refer to the docket entry number at which a pleading appears in the docket maintained by the Bankruptcy Court Clerk in the Bankruptcy Case.

changed his strategy regarding which of his multiple properties he would claim as his exempt, Texas rural homestead. First (for 15 months), the Debtor claimed four, noncontiguous parcels of real property in Navarro County, Texas, as his exempt homestead (the so-called "French Properties"—as later herein described). Then, more than three months after receiving objections to his homestead exemption from the Chapter 7 Trustee and his former spouse (the largest creditor in his bankruptcy case), the Debtor (mid-way through a hearing on their objections), announced that he would exercise his right to amend his exemptions,[2] and would claim: (a) two different parcels of real property in Freestone County, Texas that he had been both residing on and using for business purposes as his exempt homestead (hereinafter defined as the "Business Properties—60 Acres"),[3] along with (b) one of the four parcels that he had originally claimed as part of his exempt homestead (hereinafter defined as "Parcel 4 of the French Properties"). The most difficult questions presented in this contested matter are: (a) whether the Debtor's late-in-the-game amendment of his homestead exemption crossed the line between zealous advocacy into bad faith pettifoggery; and (b) does the Supreme Court's reasoning in *Law v. Seigel*[4] preclude a bankruptcy court from applying equitable doctrines to disallow a debtor's otherwise valid exemption claim. The court ultimately rules herein that the objections to the amended homestead exemption are sustained in part and overruled in part. Specifically, the court is allowing on the merits the Debtor's amended homestead exemption as to the "Business Properties—60 Acres" but is not allowing on the merits the homestead exemption as to the non-

---

[2] *See* Fed. R. Bankr. Pro. 1009(a) (providing that a debtor has the general right to amend his various bankruptcy schedules, as a matter of course, at any time before a case is closed).

[3] The court notes that the Trustee had already expended significant efforts during the case trying to sell the Business Properties—60 Acres (thinking it was non-exempt), hiring a real estate broker and conducting an auction, without objections by the Debtor.

[4] 134 S. Ct. 1188 (2014).

contiguous "Parcel 4 of the French Properties." However, the court also rules that *Law v. Siegel*: (a) ***does***, in fact, generally preclude a bankruptcy court from disallowing a debtor's otherwise valid exemption claim based on bad faith or other equitable considerations; and (b) ***does not***, in fact, denude a bankruptcy court of its essential "authority to respond to debtor misconduct" [5] associated with exemptions by imposing meaningful sanctions. Accordingly, pursuant to this court's inherent power to sanction, under section 105(a) of the Bankruptcy Code (as later explained herein), the court is further ordering that the Debtor and Debtor's counsel reimburse: (a) the Trustee and his counsel for **$25,245** in total fees, and (b) his former wife, Estela, and her counsel for **$5,109.50** in total fees—all of which the court determines to have been incurred as a result of the Debtor's bad faith actions in abruptly amending his homestead exemption only after the Trustee, Estela, and this court had expended significant resources in preparing for a contested hearing that should have never gone forward. [6]

## I.      JURISDICTION

Bankruptcy subject matter jurisdiction exists in this contested matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding, pursuant to 28 U.S.C. §157(b)(2)(A), (B), and (O), and, thus, the bankruptcy court has statutory authority to enter a final order. Moreover, the court has determined that it has Constitutional authority to enter a final order in this matter as well, since it involves a dispute that can only arise in a bankruptcy case. [7] Venue is proper before this court, pursuant to 28 U.S.C. §§ 1408 and 1409. This Memorandum Opinion constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure

---

[5] *Id.* at 1198.

[6] The liability for these fees shall be joint and several against the Debtor and his counsel, since the court has been unable to determine which of them is more culpable, due to the assertion of attorney client privilege.

[7] *See Stern v. Marshall*, 131 S. Ct. 2594 (2011); *Exec. Benefits Ins. Agency v. Arkinson*, 134 S. Ct. 2165 (2014).

7052, as incorporated into contested matters, pursuant to Federal Rule of Bankruptcy Procedure 9014. Where appropriate, a finding of fact should be construed as a conclusion of law and *vice versa*.

## II. FINDINGS OF FACT

1. On September 23, 2013, Gonzalo Saldana (the "Debtor" or "Mr. Saldana") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, Case No. 13-34861 (the "Bankruptcy Case"). At the time of the filing, the Debtor owned and operated a large tree-farming business known as Mexia Nursery & Tree Farm, Inc. ("Mexia Nursery") and also owned a separate business that was no longer operating known as Mexia Tire Company, LLC ("Mexia Tire"). The two business entities each filed voluntary petitions for relief under Chapter 11 at the same time as the Debtor. Initially, all three cases were administratively consolidated. After several months of attempting to reorganize, the Debtor and the businesses are now in Chapter 7 liquidation cases.[8]  John H. Litzler (the "Trustee") was appointed as the Chapter 7 Trustee of the Debtor's Bankruptcy Case and continues to serve in that capacity. The two business entities each have their own, separate Chapter 7 trustees.

2. Although there was uncertainty at the commencement of the three cases regarding the amount of claims that would be asserted against the Debtor, the largest creditor in the Debtor's case, by far, has turned out to be his former wife of 39 years, Estela B. Saldana ("Estela"), who asserts a claim against him in excess of $2.5 million as a result of a prepetition Divorce Decree entered by the 13th Judicial District Court of Navarro County, Texas, on

---

[8] On August 4, 2014, the Debtor filed a voluntary Motion to Convert from Chapter 11 to Chapter 7. On August 5, 2014, the court entered an Order of conversion.

October 12, 2011 (the "Divorce Decree").[9] There were fifteen proofs of claim filed in the Debtor's case: (a) ten of which were filed by property taxing authorities; (b) one of which was Estela's; (c) two filed by financial institutions; (d) one relating to a credit card; and (e) one by a utility. The total dollar amount of the proofs of claim filed was $2,721,831.68, and Estela's claim was $2,551,568.41 of this amount. Thus, there are $170,263.20 of "other" prepetition creditors in the Debtor's case, besides Estela. Restated, Estela asserts 93.74% of the prepetition claims in this case and the other creditors assert 6.26% of the prepetition claims.

3.     The Debtor had numerous parcels of real property at the time he filed bankruptcy in several counties, including Navarro, Limestone, Henderson, and Freestone Counties (the "Real Property"). The Divorce Decree stated that Estela was granted an equitable lien in the Real Property as security for the monetary award granted to her in the Divorce Decree.

4.     On September 25, 2013, the Debtor filed his Original Schedules in the Bankruptcy Case.[10] On June 2, 2014, the Debtor filed his Amended Schedules A, H and E.[11] On August 19, 2014, the Debtor filed his Amended Schedules in connection with the conversion of his case, in which the Debtor amended Schedules A and B.[12] The Debtor listed the current value of all of his Real Property at $1,255,490 in his Amended Schedules.

5.     Despite the various amendments to his Bankruptcy Schedules, the Debtor consistently—for the first 15-plus months of his case—claimed on his Schedule C, as his exempt

---

[9] The Divorce Decree was upheld on appeal in the state courts up through the Texas Supreme Court. However, the Debtor asserts that Estela: (a) received a fraudulent transfer as a result of the Divorce Decree (and the valuations contemplated therein); and (b) committed fraud (by omission of certain information) in connection with the Divorce Decree. The Debtor has objected to Estela's proof of claim, filed an adversary proceeding against her, and also has initiated a new state court bill of review proceeding to challenge the Divorce Decree. This court stayed the proof of claim litigation and adversary proceeding, pending a resolution of the state court bill of review process.

[10] *See* DE # 8 in the Bankruptcy Case.

[11] *See* DE ## 158 & 159 in the Bankruptcy Case.

[12] *See* DE # 225 in the Bankruptcy Case.

homestead under Texas law,[13] four separate parcels of his Real Property, which he valued at

$401,952.72 (the "Homestead Exemption"):

- .50 AC, TRACT 5A, A-10021; D.D. ANDERSON ABST. AKA 14469 STATE HIGHWAY 14, WORTHAM, TEXAS, NAVARRO COUNTY ("Parcel 1—the Homesite");
- 22.706 ACRES, TRACT 6, A 10021; D.D. ANDERSON ABST. AKA STATE HIGHWAY 14, WORTHAM, TEXAS, NAVARRO COUNTY ("Parcel 2");
- 48.30 ACRES MORE OR LESS, TRACT A-10021 D.D.ANDERSON ABSTRACT, NAVARRO COUNTY, TEXAS AKA STATE HWY 14, WORTHAM, TEXAS ("Parcel 3"); and
- 141.24 ACRES, TRACT 2, A-10415; HT & B RR CO.ABST., AKA STATE HWY 14, WORTHAM, TEXAS, NAVARRO COUNTY ("Parcel 4")

(Parcel 1—the Homesite, Parcel 2, Parcel 3, and Parcel 4 will collectively be referred to as the

"French Properties").

6.      On September 26, 2014, the Trustee filed his Objection to Exemptions, which

included an objection to the Debtor asserting a Homestead Exemption in the French Properties

(the "Original Objection to Exemptions").[14]  In the Original Objection to Exemptions, the

Trustee objected to the Debtor's Homestead Exemption on the following bases: (a) the Debtor

did not have a ***present*** right to occupy Parcel 1—the Homesite on the French Properties pursuant

to the Divorce Decree (the Debtor had, at best, a ***future*** interest in Parcel 1—the Homesite,

which did not entitle him to homestead protection in that property);[15] (b) as the Debtor had no

---

[13] The Debtor elected to designate these four parcels as exempt homestead property under the state law of his domicile, pursuant to section 522(b)(3)(A) of the Bankruptcy Code, and Tex. Const. Art. 16 §§ 50 & 51 and section 41.002(b) of the Texas Property Code.

[14] *See* DE # 246 in the Bankruptcy Case.  The Original Objection to Exemptions also contained an objection to the Debtor claiming a certain coin collection as exempt.

[15] The Divorce Decree specifically provided that Estela would have the "exclusive use and possession of" Parcel 1—Homesite until her receipt of $2.6 million owed under the Divorce Decree (which receipt of funds has still not occurred, more than three years after the Divorce Decree). *See Laster v. First Huntsville Props.*, 825 S.W.2d 125, 130 (Tex. 1991) ("one who holds only a future interest in property with no present right to possession is not entitled to homestead protection in that property); *In re Brunson*, No. 13-10357, 2013 WL 4657656 (Bankr. W.D.

present right in Parcel 1—the Homesite and, in fact, he was not using any of the four parcels of the French Properties as a residence, the Debtor did not have the right to claim any of the other French Properties (which were non-contiguous tracts) as part of a Homestead Exemption ("for non-contiguous tracts to qualify as part of a rural homestead, one of the tracts must be used as a residence and the other tract must be used for the comfort, convenience or support of the family")[16]; (c) the Debtor was attempting to exceed the 200 acres permitted by Texas statute for a homestead[17] (the four Parcels added up to 212.746 of total acreage) and, therefore, any amount in excess of 200 acres should not be exempt; and (d) Estela held an equitable lien against the French Properties which might further impair the Debtor's asserted exemptions.[18] On October 28, 2014, Estela filed a Joinder in the Trustee's Original Objection to Exemptions.[19]

---

Tex. Aug. 30, 2013) ("homestead protection . . . can arise only in the person or family who has a present possessory interest in the subject property").

[16] *In re Schott*, 449 B.R. 697, 702 (Bankr. W.D. Tex. 2011). To be specific, Parcel 4 was not contiguous to the other three Parcels.

[17] TEX. PROP. CODE § 41.002(b)(1). Note that the Debtor has remarried, thus would be entitled to exempt 200 acres for a rural homestead and not the mere 100 acres permitted for single individuals.

[18] As will be further addressed herein, the argument that Estela has an equitable lien in the French Properties, granted to secure the Debtor's indebtedness to her created in the Divorce Decree, *that is superior to any homestead rights that the Debtor could assert in the French Properties*, was not very forcefully argued by the parties (it was given a small amount of attention in the parties' pleadings and was not orally argued extensively). Presumably, this may have been due to the fact that the Debtor continues to attack the Divorce Decree through an objection to Estela's proof of claim, an adversary proceeding, and through a state court proceeding (arguing that the Divorce Decree amounted to a fraudulent transfer and that there was also fraud in connection with the Divorce Decree) and, thus, the indebtedness owed to Estela and the equitable lien may be subject to reduction or other modification in the domestic court or other courts. However, as will later be explained, in light of section 522(c) of the Bankruptcy Code (and possibly TEX. PROP. CODE § 41.001(4), and TEX. CONST. art. XVI, § 50(a)(3)), *this court cannot help but worry that this contested matter and ruling regarding the validity of Debtor's homestead exemption is "much ado about nothing."* Why? Because there is, undeniably, plenty of non-exempt real property to pay all creditors in full except for Estela. And, very possibly, at the end of the day, the Debtor will not be able to shield an otherwise exempt homestead from a former spouse who is owed a domestic support obligation, nor stop a forced sale to pay a debt of a kind defined in TEX. CONST. art. XVI, § 50(a)(3) and TEX. PROP. CODE §41.001(4). Stated another way, the contested matter now presented, pertaining to the validity of the Debtor's homestead exemption, may only be relevant to 6.26% of the Debtor's prepetition creditors in this bankruptcy case (*i.e.,* the non-Estela creditors). And this relevancy is even further diminished when one considers that *10 of the 15 proofs of claim* on file were filed by real estate taxing authorities that are not only likely significantly over-secured, but also presumably will care mostly about their *in rem* rights on the property to which their tax claims relate (and likely nothing else). The relevancy is even further diminished when one observes that yet *two other of the 15 proofs of claim* were filed by secured financial institutions who have non-exempt collateral to look to for payment.

7.      On October 27, 2014, the Debtor filed his Response Opposed to the Original Objection to Exemptions, in which the Debtor defended his Homestead Exemption in the French Properties.[20]

8.      Meanwhile, after filing the Original Objection to Exemptions, the Trustee was engaged with various other case administration tasks.  As noted earlier, the Debtor had numerous parcels of Real Property in four different counties. Among this Real Property were two parcels of property that the Debtor owned, but that his business entity known as Mexia Nursery had used as its place of business (hereinafter, the "Business Properties—60 Acres").  The Business Properties—60 acres were more particularly described as follows in the Debtor's Schedule B and were valued at $273,370:

- 25 ACRES MORE OR LESS OUT OF THE M. DECANTONA SURVEY, ABSTRACT 7, FREESTONE COUNTY, TEXAS AKA 767 FM 1366 MEXIA, TEXAS (the "25 Acre Tract"); and
- 35 ACRES MORE OR LESS, OUT OF THE M. DECANTONA SURVEY, ABSTRACT 7, FREESTONE COUNTY, TEXAS, AKA 767 FM 1366, MEXIA TEXAS (the "35 Acre Tract") (collectively, the "Business Properties—60 Acres")

On October 10, 2014, the Trustee filed a motion to sell the Business Properties—60 Acres (which had not been claimed as exempt), free and clear of liens, claims and encumbrances pursuant to 11 U.S.C. § 363(b) and (f) (the "Sale Motion/Business Properties") and a motion for expedited hearing for same.[21]  The court granted the motion for an expedited hearing and held such hearing on October 23, 2014.

---

[19] *See* DE # 264 in the Bankruptcy Case.

[20] *See* DE # 263 in the Bankruptcy Case.

[21] *See* DE ## 249 & 250 in the Bankruptcy Case.

9.     The Trustee, at the hearing regarding the Sale Motion/Business Properties, announced his business judgment that it would be desirable to try to sell such property at an auction, to be conducted concurrently with an auction to sell certain business personal property located thereon (which business personal property was owned by the related debtor, Mexia Nursery—the Debtor's wholly owned company).  The Trustee would work cooperatively with the trustee of the Mexia Nursery case, and both an auctioneer and a real estate broker had been retained.  The Trustee proposed a $315,000 reserve price for the Business Properties—60 Acres.  Neither the Debtor, nor any other party in interest, objected to the sale of the Business Properties—60 Acres, and the Debtor did not appear at the hearing on the Sale Motion/Business Properties.  On October 27, 2014, the court entered an Order granting the Sale Motion/Business Properties, and on October 30, 2014, the court entered an Amended Order granting the Sale Motion/Business Properties (hereinafter, the "Sale Order/ Business Properties").[22]  In the Sale Order/Business Properties, the court (1) granted the Trustee authority to sell the Business Properties—60 Acres, specifying that any valid liens would attach to the proceeds of the sale; (2) authorized the Trustee to sell the Business Properties—60 Acres through the mechanism of an auction to be held by Rosen Systems, Inc., scheduled for October 28, 2014; and (3) permitted the Trustee to immediately disburse $200,000.00 to Estela from any sale proceeds.  To be clear, at the time that the Sale Order/Business Properties was entered by the court, the Business Properties—60 Acres were not claimed by the Debtor as exempt, and the Debtor was asserting his Homestead Exemption in the French Properties.

---

[22] *See* DE ## 262 & 266 in the Bankruptcy Case.

10.     While the Business Properties—60 Acres were ultimately included in the auction and there was at least one interested bidder for the land, the Trustee did not receive an offer high enough to realize the $315,000 reserve price (which he had thought to be the fair market value of the property), and the property was not sold and remains in the estate.  The Debtor was at the auction, his current wife participated in the auction, and the Debtor never raised any complaints about the Trustee's efforts.  In any event, while the business personal property at the site was successfully auctioned off for more than a $1 million (realized by the Mexia Nursery bankruptcy trustee), the Trustee still holds the Debtor's numerous parcels of Real Property (including the Business Properties—60 Acres and the French Properties).

11.     Subsequently, the Trustee refocused his attention on the French Properties and the Homestead Exemption dispute.  On January 5, 2015, the court commenced a hearing on the Trustee's Original Objection to Exemptions and responses thereto (the "Original Exemption Hearing").  At the start of the Original Exemption Hearing, this court—noting that a significant time estimate had been given for the length of the hearing and numerous exhibits had been designated—repeatedly questioned Debtor's counsel as to what the disputed facts were and why the Debtor anticipated needing significant time to present evidence.  From the pleadings, it appeared as though the Debtor's right to assert the Homestead Exemption in the French Properties boiled down to mostly one legal issue (***whether the Debtor had "a present possessory interest" in the French Properties—since he did not live thereon or have the right to present possession pursuant to the Divorce Decree***).  The court was concerned about expending unnecessary judicial resources on what could be a fairly straightforward hearing.  In response, counsel for the Debtor unequivocally asserted that the Debtor had a right to claim the French

Properties as his homestead and that counsel for the Debtor needed to present evidence to the court as to why such exemption was valid.[23]

---

[23] *See* FTR Recording, January 5, 2015, starting at 2:38:20.  By way of example:

> Judge:  All right.  Well let me start out by asking do we really have any material disputed facts.  I mean I guess we do given the time estimates we got.  But it wasn't real clear to me from the pleadings that we had much in the way of disputed facts.
>    ***
> Judge:  All right.  [Debtor's Counsel], what say you?
>
> [Debtor's Counsel]:  Your Honor, my client is entitled to homestead exemptions and personal property exemptions under the Texas Constitution as well as state law and we're here to prove them up.  And I think there are disputed fact issues and that's why we're here to prove up his homestead exemptions in particular, as well as his personal property exemptions that have been objected to.
>
> Judge:  All right.  Then just give me a preview of what the disputed facts are.
>
> [Debtor's Counsel]:  Well there's a dispute over his homestead exemption and residence.  And there's a dispute over the coin collection and . . .
>
> Judge:  Okay.  Let me back up and again.  I hope I'm saving time and not wasting time here.  But I mean is there really a dispute over the facts or a dispute over the law because the pleadings say that the former Mrs. Saldana lives at the house that is on the French property...
>
> [Debtor's Counsel]: It's part of the French property, Your Honor.  The half acre....
>
> Judge:  ...the French Properties and the pleadings indicate that she could live there until her state court judgment amount is paid in full.  So an argument has been made that if he doesn't have a present possessory interest he can't claim it as a homestead.  So, first off, is it a legal dispute there or a factual dispute about [whether] she lives there and what the judgment says.
>
> [Debtor's Counsel]: There's both, Your Honor.  There's a factual dispute and there's a legal dispute.
>
> Judge:  What is the factual dispute?  Just preview for me.
>
> [Debtor's Counsel]:  Well, we intend to show she actually doesn't live there.  Which is one of the ...
> Judge:  Okay.  So that's a disputed fact issue.  Does she live there.  And then there is an allegation that all of these parcels are not contiguous.  Is there a fact issue about them being contiguous or not?
>
> [Debtor's Counsel]:  I think that there is a fact issue over the contiguousness of some of the parcels.  Yes, Your Honor.
>
> Judge:  Okay.  But you agree that they are not entirely contiguous.
>
> [Debtor's Counsel]:  Not all of them.
>
> Judge:  Okay.  So therefore my next question is—is there a dispute about whether all of the land is being used for the comfort, convenience and support of his family.
>
> [Debtor's Counsel]:  I think that is part of the factual dispute Your Honor.

11

12.     So the hearing began.  The Debtor took the witness stand.  Documentary exhibits were discussed.  The Debtor testified that he thought he had a present right to possession of Parcel 1—the Homesite of the French Properties, even though he had not paid Estela the full $2.6 million awarded to her in the Divorce Decree, because (he said) **Estela was not living there now**.[24]  He thought (albeit mistakenly) that the Divorce Decree permitted him possession **whenever Estela moved from Parcel 1—Homesite of the French Properties**, or the latter of June 2011 or after he paid Estela a full $2.6 million.[25]  The Debtor testified about having lived on the Parcel 1—the Homesite of the French Properties once before (prior to 2009) and still paying for the mortgage, taxes, and utilities on it.  Then, more than an hour into the Original Exemption Hearing, the questioning by Debtor's Counsel seemed to be pivoting toward asking about the **Business Properties—60 Acres**.  The Debtor unequivocally testified that he and his current wife had been living at an apartment at the Business Properties—60 Acres for several years; he testified about its proximity to Parcel 4 of the French Properties; and he testified about what expenses the Debtor was paying for this property and for various other non-French Properties real estate.  When pressed to explain the relevance of this testimony (because the testimony was going on at substantial length), for the first time—**approximately 1 hour and 6 minutes after the hearing had started—**counsel for the Debtor **announced that the Debtor would be claiming the Business Properties—60 Acres as his designated Homestead**

---

Judge:  Okay.  All right.  And then—so how many witnesses are we going to have?

[Debtor's Counsel]:  I'm going to have two witnesses, Your Honor.

Judge:  Okay.  All right.  Well I'll entertain very brief opening statements.  I don't need more than five minutes.

[24] It was not clear from the evidence whether it is, in fact, accurate that Estela no longer is living there.

[25] *See* FTR Recording, January 5, 2015 at 3:08:17-3:10:07.

*Exemption*.[26]  When pressed as to why we were all just learning of this, Debtor's counsel simply

suggested that this is what the facts were showing—that Debtor was living on the 35-acre tract of

the Business Properties—60 Acres.[27]

13.      Thus, after pleadings were filed addressing the legal merits of the Debtor having

claimed the French Properties as his homestead, after opening statements were made regarding

the French Properties, and after significant questioning occurred regarding what the facts and

issues were with regard to the French Properties, it was announced that the Debtor would be

changing his exemptions to now assert a homestead interest in:  (a) the Business Properties—60

Acres (or at least 35 acres of it on which he was living); plus (b) Parcel 4 of the French

Properties (the 141.24 acre tract, which he had already been claiming as exempt, and was not

contiguous to the Business Properties—60 Acres, just as it was not contiguous to the French

Properties).   Anecdotally, there was disagreement at the hearing as to whether the Trustee and

his professionals (or the court, for that matter) had reason to know that the Debtor and his current

wife were living at the Business Properties—60 Acres.[28]  In any event, the Trustee and Estela

vehemently objected to this announced change in strategy—arguing estoppel theories should

preclude the abrupt about-face, and bad faith litigation tactics were at play (particularly since the

Debtor had claimed the four parcels of French Properties as his Exempt Homestead for 15

months; the Trustee's and Estela's objections thereto had been on file for more than three

months; the lawyers had prepared for and litigated at a hearing that had already gone on for more

---

[26] *See* FTR Recording, January 5, 2015 at 3:44:26.

[27] At a later hearing, Debtor's counsel stated that she was barred from elaborating on when and why the Debtor decided to change his strategy by attorney-client privilege.  *See* FTR Recording, March 30, 2015 at 4:23:40.

[28] The Debtor claimed the following address for his residence in his Voluntary Petition [DE # 1 in the Bankruptcy Case] and in an Amended Voluntary Petition [DE # 6 in the Bankruptcy Case]:  14469 State Hwy 14, Wortham, TX 76693 and showed his County of Residence as "Navarro."  This is the address for the French Properties.  The Business Properties—60 Acres are located in Mexia, Texas and in Freestone County.

than an hour regarding whether the Debtor could validly claim the French Properties as his

Homestead Exemption; and the Trustee had—just two-and-a-half months earlier—expended

extensive time and effort trying to sell the Business Properties—60 Acres with no hint from the

Debtor or his counsel that they might claim it as exempt). Debtor's counsel responded by stating

that Federal Rule of Bankruptcy Procedure 1009(a) gives a debtor the general right to amend his

Schedules, including a Schedule of Exemptions, at any time before his case is closed. It

appeared to the court that Debtor's counsel must have decided that it would be necessary to

change strategies halfway through the Original Exemption Hearing—when the Debtor's

testimony was, arguably, not being very helpful to the position that the French Properties could

validly be claimed as exempt.

14. In any event, in light of this abrupt announcement, and out of concerns for due

process, Rule 1009(a), and other considerations, the court issued an Order Granting in Part

Trustee's Objection to Exemptions, Continuing Hearing in Part on Trustee's Objection to

Exemptions and Order to Show Cause (the "Order to Show Cause").[29] The Order to Show

Cause: (1) sustained the Trustee's Objection to the Debtor's claim of a homestead exemption in

Parcel 1—the Homesite, Parcel 2, and Parcel 3 of the French Properties (after all, the Debtor's

counsel had just announced that the Debtor was abandoning a claim of exemption on these three

parcels;[30] (2) continued the hearing on the Trustee's Objection to the Debtor's claim of a

Homestead Exemption in Parcel 4 of the French Properties (the 141.24-acre, non-contiguous

tract); and (3) gave the Debtor a deadline of 11:59 p.m. on January 7, 2015 to file an Amended

---

[29] *See* DE # 308 in the Bankruptcy Case. The terms of the Order to Show Cause were stated by the court on the record at the Original Exemption Hearing; however, the actual order was not signed and entered until January 13, 2015.

[30] The court also sustained an objection to the coin collection that was being claimed as exempt.

Schedule C claiming the Business Properties—60 Acres (along with the non-contiguous Parcel 4 of the French Properties) as his exempt homestead property. The Order to Show Cause also provided that if the Debtor chose to file an Amended Homestead Exemption, as had been orally announced, he would need to show cause: (1) whether bad faith or estoppel doctrines might bar him from making such a late date amendment of Schedule C, under the facts and circumstances of this Bankruptcy Case; (2) why the Debtor and counsel did not disclose the potential for a Schedule C amendment at the beginning of the January 5, 2015 hearing, when pointedly questioned by the court as to what the disputed facts were going to be that day;[31] and (3) why the Debtor should not be ordered to pay the fees and expenses of the Trustee, the Trustee's counsel, and counsel for Estela for their costs and expenses in preparing for a contested hearing on the

---

[31] *See* n.23, supra; *see also* FTR January 5, 2015 FTR 2:38:20-2:52:05.

Judge: Again, maybe I'm not communicating the best way if there…do you agree or disagree that this Texas Supreme Court case, Laster v. Huntsville, holds that homestead protection can arise only in the person or family that has a present possessory interest in the exempt property?

[Debtor's Counsel]: I think that's a correct statement of the law your honor.

Judge: Ok, so what is our disputed fact issue?

[Debtor's Counsel]: Well, he's got homestead rights that he's asserting.

Judge: Does he have a present possessory interest in the property?

[Debtor's Counsel]: He has a present…he does your honor.

Judge: Ok…preview for me what that is.

[Debtor's Counsel]: Well your honor the only way I can do it is to get him up on the witness stand so we can get our evidence in and then we can argue about what the law says.

Judge: Well I don't want, with respect, I don't want to waste hours and hours…preview for me what the disputed fact issue…
\*\*\*
[Debtor's Counsel]: He's going to get in here and talk to you about his possessory interest in his real property.
\*\*\*
Judge: Ok so he is going to testify that he, in fact, does have a present possessory interest in this property.

[Debtor's Counsel]: Yes.

Debtor's Homestead Exemption as it currently existed at the start of the Original Exemption Hearing.

15.     On January 7, 2015, as anticipated, the Debtor filed his Amended Schedules A, B, and C.[32]  Debtor's Amended Schedule C, as expected from the turn of events at the Original Exemption Hearing, reflected that the Debtor was now asserting an exemption in the Business Properties—60 Acres, as well as Parcel 4 of the French Properties (still), under Tex. Const. Art. 16 §§ 50, 51 and Tex. Prop. Code §§ 41.001 and 41.002, with the value of the exemption listed as $464,040.00 (hereinafter, the "Amended Homestead Exemption").  To be clear, the Amended Homestead Exemption was made more than 15 months after the Debtor filed the Bankruptcy Case; more than three months after the Original Objection to Exemptions was filed; more than two months after the court entered the Sale Order/ Business Properties (that allowed for a sale of a significant portion of the property now included in the Amended Homestead Exemption; as happenstance would have it, the property did not sell); and more than an hour and six minutes after the court began hearing arguments and testimony about the merits of the Debtor's exemption claim in the French Properties.

16.     On February 4, 2015, the Trustee filed his Amended Objection to the Amended Homestead Exemption, to which Estela filed a joinder, on February 9, 2015.[33]

17.     On February 6, 2015, the Trustee filed his Notice of Fees and Expenses Incurred in Relation to Debtor's Original and Amended Exemption, pursuant to the court's Order to Show Cause, requesting fees and expenses in the amount of $26,647.24, which represented the amounts expended by Trustee's counsel, Holder Law, for services rendered to the bankruptcy

---

[32] *See* DE # 303 in the Bankruptcy Case.

[33] *See* DE ## 313 & 326 in the Bankruptcy Case.

estate in relation to the Debtor's original and amended exemptions.[34] On February 9, 2015, the Trustee filed a second Notice of Fees and Expenses Incurred in Relation to Debtor's Original and Amended Exemptions, requesting fees of $25,905.50, which represented the amount expended by the Trustee's accounting firm, Litzler, Segner, Shaw & McKenney, L.L.P. ("LSSM"), for services rendered to the bankruptcy estate in relation to the Debtor's original and amended exemptions including valuation analysis.[35] Pursuant to an Amended Supplement to Notice of Fees and Expenses Incurred in Relation to Debtor's Original and Amended Exemptions,[36] Holder Law requested an additional $1,817.50 in fees and LSSM requested an additional $3,680.50 in fees for responding to the Debtor's request for production of documents in relation to each parties' original Notice of Fees and Expenses. The Amended Supplement also requested a $400 decrease in the fees asserted by Holder Law as well as a $2,309 decrease in the fees asserted by LSSM. Accordingly, the total fees and expenses requested by Holder Law was **$28,064.74** and the total fees requested by LSSM was **$27,277**, for a total of **$55,341.74** sought by the Trustee.

18. On February 9, 2015, Estela, pursuant to the court's Order to Show Cause, also filed her Notice of Fees Incurred in Relation to the Debtor's Change of Exemptions which requested reimbursement of **$5,109.50** of attorney's fees that were billed to Estela by her law firm, Cavazos, Hendricks, Poirot & Smitham, P.C., in connection with preparations for the Original Objection Hearing.[37]

---

[34] *See* DE # 319 in the Bankruptcy Case.

[35] *See* DE # 325 in the Bankruptcy Case.

[36] *See* DE # 351 in the Bankruptcy Case.

[37] *See* DE # 327 in the Bankruptcy Case.

19.     On February 19, 2015, the Debtor objected to the Notices of Fees that had been filed by the Trustee (on behalf of Holder Law and LSSM) and Estela.[38]  The Debtor also filed a Combined Response in Opposition to Trustee's Objections to Amended Exemptions and Brief in Support Thereof and Response to Motion to Show Cause.[39]

20.     On March 30, 2015, the court held a continued hearing on the Trustee's Original Objection to Exemptions, a hearing on the Trustee's Amended Objection to Exemptions, and a hearing on this court's Order to Show Cause.

## III.     CONCLUSIONS OF LAW

### A.     First, Can the Debtor Claim a Valid Homestead Exemption in (collectively) the Business Properties—60 Acres, plus Parcel 4 of the French Properties, Under Texas Law (Putting Momentarily Aside the Estoppel and Potential Bad Faith Issues)?

Before determining whether the Debtor should be estopped or otherwise barred from amending his Homestead Exemption so belatedly and abruptly (at allegedly great surprise, expense, and inconvenience to the Trustee and Estela), the court must first determine whether the Debtor has a valid legal basis under Texas law to assert a homestead exemption in (collectively): (i) the Business Properties—60 Acres, plus (ii) the non-contiguous Parcel 4 of the French Properties.  The commencement of a bankruptcy estate creates an estate encompassing all legal and equitable interests in property of the debtor as of the petition date, including any property that might be exempt.[40]  The Bankruptcy Rules provide that, in any hearing concerning an objection to exemptions, the objecting party has the burden of proving that the exemptions are

---

[38] *See* DE ## 333 & 359 in the Bankruptcy Case.

[39] *See* DE # 332 in the Bankruptcy Case.

[40] *See* 11 U.S.C. § 541(a).

not properly claimed.[41]  The facts and law existing as of the date of the petition govern a debtor's

claimed exemptions.[42]  Moreover, a debtor in Texas is permitted to exempt property from the

bankruptcy estate using either the federal exemptions as set forth in section 522(d) of the

Bankruptcy Code or under applicable state law.[43]  Here, because the Debtor elected to exempt

his property under Texas law, this court must pivot to Texas law to interpret his exemption

rights.[44]

The State of Texas (through its Constitution and statutory regime) famously recognizes

one of the broadest homestead exemptions in the United States.[45]  Under Texas law, a homestead

claimant has the burden of establishing that his property qualifies as a homestead.[46]  Among

other things, the claimant must have a possessory interest in the homestead he or she is

claiming.[47]  But "[m]ere ownership or possessory interest is not of itself sufficient to establish a

homestead."[48]  A claimant must show "both (i) overt acts of homestead usage and (ii) the

intention on [his] part ... to claim the land as a homestead."[49]  Beyond these basic fundamentals,

---

[41] *See* Fed. R. Bankr. Proc. 4003(c).

[42] *See Zibman v. Tow (In re Zibman)*, 268 F.3d 298, 302 (5th Cir. 2001).

[43] *See* 11 U.S.C. § 522(b) (2010).  To be clear, section 522(b)(2) of the Bankruptcy Code actually contemplates that states can prohibit their citizens from having the option to choose the federal exemptions set forth in section 522(d), so that only state (or other nonbankruptcy law) exemptions will be available to such citizens (so called "opt-out" states).  Texas is not an "opt-out" state.

[44] *See Butner v. United States*, 440 U.S. 48, 54-55 (1979).

[45] *See Denmon v. Atlas Leasing, L.L.C.*, 285 S.W.3d 591, 595 (Tex. App.—Dallas 2009, no pet.).

[46] *Bradley v. Pac. Sw. Bank, FSB (In re Bradley)*, 960 F.2d 502, 507 (5th Cir. 1992).

[47] *See Laster v. First Huntsville Props.*, 825 S.W.2d 125, 130 (Tex. 1991) ("one who holds only a future interest in property with no present right to possession is not entitled to homestead protection in that property); *In re Brunson*, No. 13-10357, 2013 WL 4657656 (Bankr. W.D. Tex. Aug. 30, 2013) ("homestead protection . . . can arise only in the person or family who has a present possessory interest in the subject property").

[48] *In re Mitchell*, 132 B.R. 553, 558 (Bankr. W.D. Tex. 1991).

[49] *Kennard v. MBank Waco, N.A. (In re Kennard)*, 970 F.2d 1455, 1458 (5th Cir. 1992).

individuals are then entitled to either a rural homestead or an urban homestead. Here, the Debtor is seeking to claim the Business Properties—60 Acres and Parcel 4 of the French Properties as his rural homestead. No party has objected to the Debtor's assertion that his claimed homestead is in a rural area, as opposed to an urban area.[50]

First, turning to the Texas Constitution, Article 16, Section 51 of it states:

The homestead, not in a town or city, ***shall consist of not more than two hundred acres of land, which may be in one or more parcels***, with the improvements thereon; the homestead in a city, town or village, shall consist of lot or contiguous lots amounting to not more than 10 acres of land, together with any improvements on the land; provided, that the homestead in a city, town or village shall be used for the purpose of a home, or as both an urban home and a place to exercise a calling or business, of the homestead claimant, whether a single adult person, or the head of a family; provided also, that any temporary renting of the homestead shall not change the character of the same, when no other homestead has been acquired; provided further that a release or refinance of an existing lien against a homestead as to a part of the homestead does not create an additional burden on the part of the homestead property that is unreleased or subject to the refinance, and a new lien is not invalid only for that reason.[51]

Next, turning to the Texas Property Code, it similarly provides, at Section 41.002, that:

if used for the purposes of a rural home, the homestead shall consist of: (1) for a family, ***not more than 200 acres, which may be in one or more parcels, with improvements thereon***; or (2) for a single, adult person, not otherwise entitled to a homestead, not more than 100 acres, which may be in one or more parcels, with the improvements thereon.[52]

Courts have interpreted the Texas Constitution and Property Code to mean that "a rural homestead may include non-contiguous tracts."[53] "However, for non-contiguous tracts to

---

[50] *See* TEX. PROP. CODE. §41.002(c) (the court can only assume that Mexia, Texas, where the Business Properties—60 Acres are located, does not fit the definition contained in this statute for an "urban" area—although the court is somewhat surprised by this).

[51] *See* TEX. CONST. art. XVI, § 51 (emphasis added).

[52] Tex. Prop. Code. Ann. § 41.002(b) (West 2000) (emphasis added).

[53] *See In re Schott*, 449 B.R. 697, 702 (Bankr. W.D. Tex. 2011); *see also Perry v. Dearing (In re Perry)*, 345 F.3d 303, 318 (5th Cir. 2003).

qualify as part of a rural homestead, one of the tracts must be used as a residence and the other tract must be used for the comfort, convenience or support of the family."[54] Texas courts have recognized that cattle grazing or hunting, when coupled with some additional usage, can demonstrate that the non-contiguous tract qualifies as a rural homestead. [55]

Here, the Business Properties—60 Acres are composed of two contiguous tracts (a 35-acre tract and a 25-acre tract), and the Debtor testified that he has resided on the Business Properties—60 Acres with his current wife for several years now. There was no evidence to the contrary—other than the fact that, for whatever reason, he had used the French Properties address in Wortham, Navarro County, Texas as his residential address on his Voluntary Petition and an Amended Voluntary Petition. Thus (estoppel and bad faith issues aside), it appears to this court that the Debtor would be permitted to exempt the Business Properties—60 Acres as his Texas homestead (*i.e.,* a rural homestead—since no one has argued or presented evidence to the contrary). Parcel 4 of the French Properties (the 141.24-acre tract), on the other hand, is non-contiguous, and is approximately 15 miles from the Business Properties—60 Acres (in a different county), so the Debtor would need to show that he is using it for the comfort,

---

[54] *Schott*, 449 B.R. at 702 (*citing Perry*, 345 F.3d at 318, n. 22 (if part of rural property is noncontiguous to property on which the home is situated, then, to constitute part of the homestead, the separate land must be "used principally for the purposes of a home")); *In re Baker*, 307 B.R. 860, 863 (Bankr. N.D. Tex. 2003) ("If the party claiming rural homestead protection resides on a separate tract of land, the uninhabited property must be used in connection with the home tract for the comfort, convenience, or support of the family.")

[55] *PaineWebber, Inc. v. Murray*, 260 B.R. 815, 830-32 (E.D. Tex. 2001) (holding land as rural homestead where evidence was presented that debtor chopped wood, built a duck blind, irrigated, and farmed or sharecropped the land, and also used land for walking, picnicking, gardening, growing hay, hunting, and cutting wood); *Cocke v. Conquest*, 35 S.W.2d 673, 676–78 (1931) (imposing rural homestead protection on a non-contiguous tract because the land was used for grazing cattle and farming); *Fajkus v. First Nat'l Bank of Giddings*, 735 S.W.2d 882, 884-85 (Tex.App.—Austin, 1987, writ denied) (affirming jury determination of rural homestead protection on a non-contiguous tract because the landowners cleared brush, planted grass, and were grazing cattle on the land).

convenience, or support of his family in order to include it as part of his designated rural homestead exemption under Texas law.[56]

Here, the Debtor's only testimony regarding his usage of the 141.24-acre tract was that he used it to "grow some trees" and also had some cows on the property at some point.[57] The Debtor also testified that, once it had incorporated, he had allowed the Debtor's now defunct business, Mexia Nursery,[58] to grow some trees on the 141.24-acre tract. However, not only was the Debtor's testimony very vague as to when, what and where this actually occurred, but the court observes that in the Debtor's Amended Schedule B (which was filed on January 7, 2015, per this court's Order to Show Cause), at question 31, which requires the Debtor to list any "Animals" he owns, the Debtor stated that he only owned four horses (no cows), and at question 32, which requires the Debtor to list "Crops-growing or harvested. Give Particulars," the Debtor listed nothing. In the Schedules originally filed by the Debtor in this case on September 25, 2013, at question 31, the Debtor stated that he owned "All livestock awarded by the just and right judgment of the 13th District Court, Navarro County, Texas in Case # 10-19768-CV, In re Marriage of Gonzalo and Estela Saldana, filed October 14, 2011. AT TIME OF DECREE; 29 COWS, 2 BULLS, 17 CALVES, 2 HORSES, located at 14469 SH 14, Wortham, Texas 76693 and/or various other real property owned by the Debtor. ALL CATTLE SOLD. DEBTOR

---

[56] The Debtor acknowledged at the hearing on the Amended Objection to Exemptions that he was seeking to exempt more than 200 acres of land (60 acres plus 141.24 acres equals 201.24 acres) and acknowledged that he would only claim a portion of the 141.24-acre tract so that his total homestead exemption did not exceed 200 acres. *See* FTR Recording, March 30, 2015 at 4:17:30-4:17:57.

[57] *See* FTR Recording, January 5, 2015 at 3:21:19-3:23:22.

[58] As noted earlier, the debtor's business, Mexia Nursery and Tree Farm, Inc. (Case No. 13-34862), was an operating business when it filed Chapter 11 along with the Debtor on September 23, 2013. However, the business is now no longer operating and the case has been converted to Chapter 7.

NOW OWNS ONLY 4 HORSES."[59]  Thus, it appears to the court, in actuality, that the Debtor

no longer has any cows on the 141.24-acre tract (to the extent the Debtor's testimony suggested

otherwise, the court did not find his testimony to be credible), and that any trees that he was ever

growing there were for a business that is no longer operating.  In conclusion, the court finds that

the totality of the evidence it has before it, even construing such evidence liberally, [60] does not

rise to the level of using the 141.24-acre tract for the "comfort, convenience, or support of his

family."  Even the four horses that the Debtor claims to still own are located, according to the

Debtor's testimony, on the Business Properties—60 Acres.[61]  The court heard no credible

evidence to reasonably conclude that the 141.24 acres fits into the category of non-contiguous

rural property that is used or necessary for the "comfort, convenience, or support" of the

Debtor's family.  The court is sustaining the Trustee's Original Objection and the Amended

---

[59] The four horses were claimed as exempt and, while they were shown to have an "unknown" value, the Debtor used a $2,000 value for the amount of his exemption applying to the four horses.  *See* DE # 303 (Amended Schedule C).

[60] *See Perry*, 345 F.3d at 316.

[61] *See* January 5, 2015 FTR 3:24:40-3:25:20 (questioning of the Debtor):

Q: The 35 Acres where Mexia Nursery was being run?

A: Yes.

Q: Prior to Mexia Nursery coming into existence, what were you doing with that property?

A: Nothing really.

Q: Did you have cows on there?

A: I had some cows and horses on there, yes.

Q: How about the 25 acres, what were you doing with that property prior to allowing Mexia Nursery to operate on it?

A: Same thing, actually I still have 4 horses on there.

Q: You still have 4 horses on there?

A: Yes Ma'am.

Objection as to Parcel 4 of the French Properties (*i.e.,* the 141.24-acre tract) and will not permit the Debtor to exempt this property as part of his rural homestead. Accordingly, the Debtor would only be entitled to claim a homestead exemption in the Business Properties—60 Acres (assuming estoppel and bad faith issues do not otherwise preclude him).

**B. Is the Debtor Nonetheless Barred in Asserting the Amended Homestead Exemption Due to Bad Faith/Prejudice to Creditors or Judicial Estoppel?**

While the Debtor appears to have met the standard, under state law, to exempt the Business Properties—60 Acres as his homestead, the court next turns to whether the application of certain equitable theories, including bad faith/prejudice to creditors and judicial estoppel, would nonetheless bar the Debtor from amending his Bankruptcy Schedules, at such a late stage, to change his exemptions—particularly in a situation in which the parties and court had already conducted half of a hearing regarding the Original Exemption Objections.

*1. Bad Faith/Prejudice to Creditors*

When a debtor files a Chapter 7 bankruptcy petition, all of the debtor's assets become property of the bankruptcy estate subject to the debtor's right to reclaim certain property as "exempt."[62] The Bankruptcy Code places a single limitation on the debtor's ability to exercise this right: That the debtor "file a list of property that the debtor claims as exempt."[63] The Bankruptcy Rules, in turn, specify this procedure, requiring the debtor to "list the property claimed as exempt under § 522 of the Code on the schedule of assets required to be filed by Rule 1007,"[64] and to file this schedule "with the petition or within 14 days thereafter."[65] Moreover,

---

[62] *Schwab v. Reilly*, 560 U.S. 770, 774 (2010) (citations omitted).

[63] *See* 11 U.S.C. § 522(l).

[64] *See* Fed. R. Bankr.P. 4003(a).

[65] *See* Fed. R. Bankr.P. 1007(c).

significantly, Federal Rule of Bankruptcy Procedure 1009 ("Rule 1009") provides that a "schedule ... may be amended by the debtor as a matter of course at any time before the case is closed," and the Fifth Circuit has interpreted Rule 1009 as prohibiting courts from denying a debtor's request to amend its schedules, unless a creditor demonstrates the debtor's bad faith or that there would be prejudice to creditors in allowing such amendment.[66] The Fifth Circuit adopted this approach from the Eleventh Circuit's ruling in *In re Doan,* where the Eleventh Circuit held that "a court may deny leave to amend if there is a showing of the debtor's bad faith or of prejudice to the creditors."[67] However the Eleventh Circuit's reasoning (and ultimate ruling) in *In re Doan* (as later adopted by the Fifth Circuit) is now dubious, at best, as a result of the Supreme Court's recent decision in *Law v. Siegel.*[68]

In *Law v. Siegel*, the Supreme Court addressed the scope and application of section 105(a) of the Bankruptcy Code to remedy an egregious case of bad faith conduct by a debtor in connection with his exempt homestead. Specifically in *Law v. Siegel*, the debtor, who filed a Chapter 7 case in the State of California, owned a house that he valued at $363,348, of which he claimed $75,000 as exempt under California law.[69] The debtor had also claimed that there were two voluntary liens on the property (one held by Washington Mutual, who was owed $147,156.52, and a second in favor of Lin's Mortgage & Associates, who was allegedly owed $156,929.04). Since these two liens exceeded the nonexempt value, this left no equity for

---

[66] *See* Fed. R. Bankr.P. 1009(a); *Lowe v. Sondoval (In re Sandoval)*, 103 F.3d 20, 22 (5th Cir. 1997) (citing *Stinson v. Williamson (In re Williamson)*, 804 F.2d 1355, 1358 (5th Cir. 1986)).

[67] *Williamson*, 804 F.2d at 1358 (quoting *Doan v. Hudgins (In re Doan)*, 672 F.2d 831, 833 (11th Cir. 1982)); *see also Hannigan v. White (In re Hannigan)*, 409 F.3d 480, 482 (1st Cir. 2005); *In re Yonikus*, 996 F.2d 866, 872 (7th Cir. 1993); *Calder v. Reta JOB (In re Calder)*, 973 F.2d 862, 867 (10th Cir. 1992).

[68] *Law v. Seigel*, 134 S. Ct. 1188 (2014).

[69] *Id.* at 1190.

creditors.[70] The Chapter 7 trustee ultimately challenged the lien held by Lin's Mortgage & Associates, in a subsequent adversary proceeding, where it was ultimately discovered that the Lin lien was a fiction created by the debtor to fraudulently preserve more equity in the home.[71] The trustee spent over $500,000 in prosecuting the fraudulent lien and was ultimately successful.[72] When the trustee later sold the home, he sought to surcharge the debtor's $75,000 homestead exemption with the costs that he had expended in avoiding the fraudulent lien.[73] The bankruptcy court allowed the surcharge and was affirmed by the bankruptcy appellate panel for the Ninth Circuit, but, the Supreme Court ultimately reversed.

Specifically, the Supreme Court noted that the surcharge conflicted with two subsections of the Bankruptcy Code: section 522(b) of the Bankruptcy Code, which allows a debtor to exempt property in the first place, and section 522(k) of the Bankruptcy Code, which expressly limits the use of exempt property to pay for administrative expenses.[74] The Court also noted that section 522 of the Bankruptcy Code, "sets forth a number of carefully calibrated exceptions and limitations," which relate to the debtor's misconduct (specifically, sections 522(c), 522(o), and 522(q) of the Bankruptcy Code), and that this was yet a further demonstration that courts were not empowered to create additional exceptions.[75] The Supreme Court acknowledged that its holding forced trustees to shoulder a heavy financial burden resulting from a debtor's egregious misconduct, and that it may produce inequitable results for trustees and creditors in other cases,

---

[70] *Id.*

[71] *Id.*

[72] *Id.* at 1193.

[73] *Id.*

[74] *Id.* at 1195.

[75] *Id.* at 1196.

but, in crafting the provisions of section 522 of the Bankruptcy Code, the Supreme Court noted that "Congress balanced the difficult choices that exemption limits impose on debtors with the economic harm that exemptions visit on creditors and the same can be said of the limits imposed on recovery of administrative expenses by trustees."[76] Thus, the Supreme Court held that it was not the place of courts to alter the balance struck by the statute.[77] In summary, the Supreme Court held that the surcharge (ordered by the bankruptcy court under the alleged authority of section 105) exceeded the court's authority, as it was a circumvention of the other specific provisions of sections 522(b) and (k). The surcharge, while intended to compensate the estate for monetary costs imposed by the debtor's misconduct, **would equate to an outright denial of his homestead exemption**. The deadline to object to his homestead exemption expired before the surcharge was imposed. Moreover, there has to be a valid statutory basis to disallow an exemption (in the Code or under State law). "Section 522 does not give courts discretion to grant or withhold exemptions based on whatever considerations they deem appropriate."[78]

Although the holding in *Law v. Siegel* might initially appear to be narrow—applicable only to the notion of attempting to equitably surcharge an exemption—the court believes that the Supreme Court has essentially spoken on the issue of whether a court may disallow a debtor's claim of exemption based on bad faith or delay or prejudice to creditors. Specifically, the Supreme Court noted that:

> a handful of courts have claimed authority to disallow an exemption (or to bar a debtor from amending his schedules to claim an exemption, which is much the same thing) based on the debtor's fraudulent concealment of the asset alleged to be exempt. *See, e.g., In re Yonikus*, 996 F.2d 866, 872–873 (C.A.7 1993); *In re*

---

[76] *Id.* at 1197-98.

[77] *Id.* at 1198.

[78] *Id.* at 1196.

*Doan*, 672 F.2d 831, 833 (C.A.11 1982) (per curiam); *Stewart v. Ganey*, 116 F.2d 1010, 1011 (C.A.5 1940). ***He [the trustee] suggests that those decisions reflect a general, equitable power in bankruptcy courts to deny exemptions based on a debtor's bad-faith conduct.   For the reasons we have given, the Bankruptcy Code admits no such power.[79]***

Again, while the issue in *Law v. Siegel* was whether a trustee could **surcharge** a debtor's exempt property based upon a debtor's egregious acts during a bankruptcy case, the court concludes that *Law v. Seigel,* nonetheless, implicitly overruled prior case law (including the Fifth Circuit's holding in *In re Williamson* which relied on the Eleventh Circuit's holding in *In re Doan*) that enabled a bankruptcy court to deny an amendment to the debtor's homestead exemption based on bad faith or prejudice to creditors.[80]

Notably, the Supreme Court in *Law v. Siegel* did appear to leave open the possibility that state law may offer some independent basis to disallow an otherwise appropriate exemption that was created under state law.  Specifically, the Supreme Court stated that "[it] is of course true that when a debtor claims a state-created exemption, the exemption's scope is determined by state law, which may provide that certain types of debtor misconduct warrant denial of the exemption."[81]  Here, the Debtor has asserted his homestead exemption utilizing the Texas homestead statutes; thus, if Texas law provides a mechanism for denying the Debtor's ability to change his homestead exemption freely, the court may be empowered to deny the Debtor's right to amend his Bankruptcy Schedules in this case.  The Trustee appears to argue that judicial

---

[79] *Id.* (emphasis added).

[80] *See also Westry v. Lim (In re Westry)*, No. 14-440, 2014 WL 7398898, at *432 (6th Cir. Dec. 30, 2014) (holding that *Law v. Siegel* strongly suggests that a bankruptcy court exceeds its authority when it disallows an amendment based upon prejudice to creditors, but finding that it need not determine the exact perimeters of the bankruptcy court's discretion to disallow such amendments based on prejudice since there was no adequate showing of prejudice); *Gray v. Warfield (In re Gray)*, 523 B.R. 170, 173-175 (9th Cir. B.A.P. 2014) (Albeit in dicta, the Supreme Court in *Law v. Siegel* found no equitable power in the bankruptcy court to deny an exemption as a remedy to debtor's bad faith conduct).

[81] *Id.* at 1196-97.

estoppel could be one of the state law mechanisms alluded to by the Supreme Court in *Law v. Siegel*.

### 2. Judicial Estoppel

The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.[82] Here, the Trustee has argued that the Sale Order/Business Properties entered by this court judicially estops the Debtor from amending his homestead exemption since the Sale Order/Business Properties contemplates a sale of such property, free and clear of all liens, claims and encumbrances, pursuant to section 363(f) of the Bankruptcy Code (which would arguably include a homestead exemption claimed by the Debtor) and the Debtor never objected to entry of the Sale Order/Business Properties or argued that he had a homestead interest in the Business Properties—60 Acres. While it is true that judicial estoppel has been developed through state courts in Texas, the Trustee has cited to no case (and the court was unable to find one) in which a Texas court has applied judicial estoppel to disallow a statutory homestead exemption.[83] As a result, the court declines the Trustee's invitation to create a "judge-made" exception to Texas homestead law (which was admonished by the Supreme Court in *Law v. Siegel*) and concludes that judicial estoppel cannot be applied to prevent the Debtor from amending his existing exemptions and asserting a homestead exemption in the Business Properties—60 Acres.

---

[82] *See Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008) (The doctrine of judicial estoppel precludes a party from adopting a position inconsistent with one successfully maintained in an earlier proceeding.); *see also Andrews v. Diamond, Rash, Leslie & Smith*, 959 S.W.2d 646, 650 (Tex. App.—El Paso 1997, writ denied).

[83] There is an established rule of law in Texas that when the physical facts open to observation lead to a conclusion that the property in question is not the homestead of the mortgagor, and its use is not inconsistent with the representations made that the property is disclaimed as a homestead, and these representations were intended to be and were actually relied upon by a lender, then the owner is estopped from asserting a homestead claim in derogation of the mortgage to secure the loan. *Shearer v. Allied Live Oak Bank*, 758 S.W.2d 940, 945 (Tex. App—Corpus Christi 1988, writ denied) (citing *Prince v. N. State Bank of Amarillo*, 484 S.W.2d 405, 411 (Tex. Civ. App.—Amarillo 1972, writ ref'd n.r.e.)). However, the court finds that this rule would not apply to the facts of this case as the court is addressing issues between a debtor and bankruptcy trustee versus a mortgagor and lender.

In summation, since the holding in *Law v. Siegel* has taken away a bankruptcy court's discretion to grant or withhold exemptions based on equitable considerations (*i.e.,* there must be a valid statutory basis to disallow an exemption under the Bankruptcy Code or some basis under State law), and since Texas law provides no independent avenue for doing so, the court concludes that there is no legal basis to preclude the Debtor from amending his Schedules to assert a homestead exemption in the Business Properties—60 Acres, even at a very late date that was prejudicial to creditors and may have hinted at bad faith. Nevertheless, the Supreme Court in *Law v. Siegel* did state that ample authority remained to address a debtor's misconduct in connection with his exemption claims or alleged bad faith litigation conduct associated therewith, including possible sanctions under the Bankruptcy Rules, section 105(a) of the Bankruptcy Code, or a bankruptcy court's inherent powers. Thereafter, any monetary sanctions may be enforced through the normal procedures for collecting a money judgment. Thus, the court now explores whether there are grounds to impose monetary sanctions (in the form of fee shifting) as requested by the Trustee and Estela.

### C.    Fee Shifting

To be clear, the Supreme Court in *Law v. Siegel* stated that:

Our decision today does not denude bankruptcy courts of the essential "authority to respond to debtor misconduct with meaningful sanctions." Brief for United States as Amicus Curiae 17. There is ample authority to deny the dishonest debtor a discharge. See § 727(a)(2)–(6). (That sanction lacks bite here, since by reason of a postpetition settlement between Siegel and Law's major creditor, Law has no debts left to discharge; but that will not often be the case.) **In addition, Federal Rule of Bankruptcy Procedure 9011—bankruptcy's analogue to Civil Rule 11—authorizes the court to impose sanctions for bad-faith litigation conduct, which may include "an order directing payment. . . of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation."** Fed. Rule Bkrtcy. Proc. 9011(c)(2). The court may also possess further **sanctioning authority under either § 105(a) or its inherent powers**. Cf. Chambers, 501 U.S., at 45–49, 111 S.Ct. 2123. And because it arises postpetition, a bankruptcy court's monetary sanction survives the

> bankruptcy case and is thereafter enforceable through the normal procedures for collecting money judgments. See § 727(b). Fraudulent conduct in a bankruptcy case may also subject a debtor to criminal prosecution under 18 U.S.C. § 152, which carries a maximum penalty of five years' imprisonment.[84]

Thus, while the bankruptcy court does not have the authority to deny the Debtor his right to amend his exemptions, a bankruptcy court, more generally, may impose sanctions, including fee shifting, pursuant to Federal Rule of Bankruptcy Procedure 9011 ("Rule 9011") or section 105(a) of the Bankruptcy Code, to remedy bad faith litigation tactics used by a debtor and/or his counsel. Thus, the court explores below what may be appropriate in this regard.

> *1. Federal Rule of Bankruptcy Procedure 9011.*

The purpose of Rule 9011 is to deter litigation abuse that is the result of a particular pleading, written motion, or other paper and make proceedings more expeditious and less expensive.[85] It has been interpreted as imposing on counsel the need to "stop, look, and listen," before signing and filing documents.[86] Rule 9011(b) states as follows:

> (b) Representations to the court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification or reversal of existing law or the establishment of new law; (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery ...[87]

---

[84] *Law*, 134 S. Ct. at 1198.

[85] *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 97 (3d Cir. 2008); *Miller v. Cardinale (In re Deville)*, 280 B.R. 483, 492 (9th Cir. B.A.P. 2002).

[86] *Household Credit Servs. v. Melton (In re Melton)*, 217 B.R. 869, 873 (Bankr. D. Colo. 1998) (citing *Adamson v. Bowen*, 855 F.2d 668, 673 (10th Cir. 1988)).

[87] Fed. R. Bankr. P. 9011(b).

Those who offend Rule 9011(b) may then be sanctioned under Rule 9011(c), which provides that "if, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subsection (b) or are responsible for the violation."[88]  As stated above, the focus of Rule 9011(b) is a petition, pleading, written motion, or other paper, which here, would be the filing of the Debtor's Amended Schedule C.[89]  An attorney signing a document is typically the person against whom a Rule 9011 sanction should be imposed and a represented party should not generally be sanctioned in the absence of circumstances indicating that the client is personally aware of, or responsible for, the proscribed action.[90]  Because Rule 9011 is substantially identical to Federal Rule of Civil Procedure 11 ("Rule 11"), courts often refer to Rule 11 jurisprudence when considering sanctions under Rule 9011.[91]

Looking at the various reasons that this court could impose sanctions upon the Debtor and/or his counsel under Rule 9011(b), the only ones that could appear to apply in this case are whether or not the filing of:  (a) the Debtor's Original Schedule C (and the later advocating for it); and/or (b) the Debtor's Amended Schedule C (and the later advocating for it) was or were made for improper purpose.  The focus of a claim for sanctions under the "improper purpose" clause is on why the attorney/client filed the legal pleading at issue, and Rule 9011(b)(1) sets

---

[88] Fed. R. Bankr. P. 9011(c).

[89] *See Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 875 (5th Cir. 1988) (Rule 11 is restricted to the signing of pleadings, motions, and other papers.  Ample protection from the use of abusive tactics in litigation in respects other than the signing of papers is provided for by other rules governing attorney conduct).

[90] *Topalian v. Ehrman*, 3 F.3d 931, 935 n. 3 (5th Cir. 1993).

[91] *Cadle Co. v. Pratt (In re Pratt)*, 524 F.3d 580, 586 n. 19 (5th Cir. 2008).

forth a non-exclusive list of various improper purposes such as harassment, to cause unnecessary delay, or to needlessly increase the cost of litigation.[92]  Because direct evidence of motive, intent or purpose is rarely available at hearings, this court must look to objectively ascertainable circumstances that support an inference of improper purpose under Rule 9011(b)(1) and determine whether the signer and advocator of a pleading, motion, or other paper crossed the line between zealous advocacy and plain pettifoggery.[93]

Here, the court cannot, from the evidence and all the facts and circumstances, infer or conclude that the filing and advocating of the Debtor's Original Schedule C and then the Debtor's Amended Schedule C, was done for an "improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."  While the abrupt flip-flop that occurred, one hour and six minutes into a contested hearing, most assuredly caused unnecessary delay and needlessly increased the cost of litigation, the court concludes, taking into account the objectively ascertainable circumstances that existed at the time the schedules were filed, that the Debtor's Original Schedule C was filed for the purpose of maximizing the Debtor's exemptions (although it was weakly supported by the facts and law), and the Debtor's Amended Schedule C

---

[92] *Computer Dynamics, Inc. v. Merrill (In re Computer Dynamics, Inc.)*, 252 B.R. 50, 57 (Bankr. E.D. Va. 1997) ("The enumerated improprieties are examples only of the type of conduct proscribed by the Rule.").

[93] *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 581 (5th Cir. 2008) (affirming the directive that a court should be looking for "objectively ascertainable circumstances that support an inference that a filing ... caused unnecessary delay"); *see also Long v. Thommessen (In re Tjontveit)*, 204 Fed. Appx. 439, at *2 (5th Cir. 2006) (affirming bankruptcy court's issuance of Rule 9011(b)(1) sanction against party for filing motion for sanctions against bankruptcy trustee, finding that party had engaged in "a pattern of activity," suing repeatedly and frivolously); *In re Enmon*, No. 12-10268, 2013 WL 494049, at *5 (Bankr. E.D. Tex. Feb. 7, 2013) (bankruptcy attorney was sanctioned pursuant to Rule 9011(b)(1) for the filing of a Chapter 11 bankruptcy petition and improperly invoking the automatic stay for the sole purpose of achieving a litigation objective rather than in a good faith rehabilitation attempt); *In re Stromberg*, 487 B.R. 775, 808 (Bankr. S.D. Tex. 2013) (debtor's attorney who electronically filed debtor's original schedules and original SOFA, representing with a "/s/" that the debtor had signed these documents when, in fact, he had not was a violation of Rule 9011(b)(1)); *In re Dental Profile, Inc.*, 446 B.R. 885, 900 (Bankr. N.D. Ill. 2011) (the court must look to "objectively ascertainable circumstances that support an inference" of improper purpose under Rule 9011); *United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1344 (2d Cir. 1991) (in deciding whether the signer of a pleading, motion, or other paper has crossed the line between zealous advocacy and plain pettifoggery, the court applies an objective standard of reasonableness.)

33

was filed for the purposes of salvaging a homestead exemption for the Debtor, when it became suspected that the Debtor's position with regard to the more-valuable French Properties was going to be a losing one. In fact, had the Debtor not amended his schedules, the Debtor would likely have lost the right to claim any property as his homestead. While the Debtor's and his counsel's actions, in amending his homestead exemption, so late in the game and mid-way through a hearing, certainly seem to warrant some sanctions or fee shifting (particularly when: (a) the court and opposing parties had prepared for a hearing involving the French Properties; and (b) the court pointedly and repeatedly asked at the beginning of the Original Exemptions Hearing what the contested facts or issues would be, and counsel for the Debtor gave no indication that the Debtor might want to amend his Homestead Exemption mid-way through the hearing),[94] Rule 9011 does not appear to be the means to imposing such a sanction. However, as stated above, the Supreme Court's *Law v. Siegel* ruling did leave the court at least one additional avenue to potentially address the Debtor's and his counsel's conduct in this case—specifically, section 105(a) of the Bankruptcy Code.[95]

### 2.    *Section 105(a) of the Bankruptcy Code*

When a party's conduct is not effectively sanctionable pursuant to an existing rule or statute (*i.e.*, Rule 11 or 28 U.S.C. § 1927), it may nevertheless be appropriate for a court to turn to its inherent power to impose sanctions.[96] Inherent sanctioning power is "based on the need to control court proceeding[s] and [the] necessity of protecting the exercise of judicial authority in

---

[94] *See* notes 23 & 31, *supra*.

[95] *Law*, 134 S. Ct. at 1198.

[96] *See Chambers v. Nasco, Inc.*, 501 U.S. 32, 50 (1991); *see also Carroll v. The Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997).

connection with those proceedings."[97]  A court's inherent power is not "a broad reservoir of power, ready at the imperial hand, but a limited source; an implied power squeezed from the need to make the court function."[98]

As to the court's ability to use its inherent power to fee shift, the general rule in federal courts is that a prevailing party cannot recover attorney's fees absent specific statutory authority, a contractual right, or certain special circumstances.[99]  This rule "is so venerable and ubiquitous in American courts it is known as the 'American Rule'".[100]  The American Rule, however, does have several exceptions.  Specifically, the Supreme Court has recognized that courts have the inherent power to issue sanctions against litigants for their bad faith conduct and that a court may assess attorney's fees as a sanction when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.[101]  The threshold for invocation is high and, if such inherent power is invoked, it must be exercised with restraint and discretion.[102]  The Fifth Circuit has found that "the 'bad faith' actions must occur in the course of litigation" and that the bad-faith exception "does not address conduct underlying the substance of the case; rather, it refers to the conduct of the party and the party's counsel during the litigation of the case."[103]  Moreover, the Fifth

---

[97] *In re Case,* 937 F.2d 1014, 1023 (5th Cir. 1991).

[98] *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990), *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

[99] *See Aleyska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 255-60 (1975); *see also Galveston County Navigation Dist. No. 1 v. Hopson Towing Co., Inc.*, 92 F.3d 353, 356 (5th Cir. 1996).

[100] *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310-11 (Tex. 2006); *see also Crenshaw v. Gen. Dynamics Corp.*, 940 F.2d 125, 129 (5th Cir. 1991).

[101] *Chambers*, 501 U.S. at 43-46; *Aleyska*, 421 U.S. at 258-259.  Although *Chambers* involved a district court, the inherent powers described by the Supreme Court "are equally applicable to the bankruptcy court."  *Case*, 937 F.2d at 1023.

[102] *Maguire Oil Co. v. City of Houston*, 143 F.3d 205, 209 (5th Cir. 1998).

[103] *Rogers v. Air Line Pilots Assoc., Int'l*, 988 F.2d 607, 615-16 (5th Cir. 1993); *Flanagan v. Havertys Furniture Cos, Inc.*, 484 F. Supp.2d 580, 582 (W.D. Tex. 2006).

Circuit has described that the conduct required to invoke the exception to the American Rule must be "callous and recalcitrant, arbitrary, and capricious, or willfull, callous, and persistent."[104]

To be clear, a bankruptcy court's authority under section 105(a) of the Bankruptcy Code also comports with its inherent power to sanction, and some courts have found that such powers are essentially coterminous.[105] Section 105(a) of the Bankruptcy Code states that:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making the determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.[106]

Several courts have concluded that section 105(a) of the Bankruptcy Code provides a basis for a bankruptcy court to make an award of attorney's fees under certain circumstances.[107] However, regardless of whether a bankruptcy court chooses to award sanctions under its inherent authority or under section 105(a) of the Bankruptcy Code, it still must make a "specific finding of bad faith."[108]

---

[104] *Galveston County*, 92 F.3d 353, 358 (5th Cir. 1996).

[105] *Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.)*, 77 F.3d 278, 284 (9th Cir. 1996) ("By providing that bankruptcy courts could issue orders necessary 'to prevent an abuse of process,' Congress impliedly recognized that bankruptcy courts have the inherent power to sanction that *Chambers* recognized within Article III courts."); *Jones v. Bank of Santa Fe (In re Courtesy Inns, Ltd., Inc.)*, 40 F.3d 1084, 1089 (10th Cir. 1994) ("We believe, and hold, that § 105 intended to imbue the bankruptcy courts with the inherent power recognized by the Supreme court in *Chambers*); *but see Ginsberg v. Evergreen Sec. Ltd. (In re Evergreen Sec., Ltd.)*, 570 F.3d 1257, 1273 (11th Cir. 2009); *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1196 (9th Cir. 2003); *In re Rimsat, Ltd.*, 212 F.3d 1039, 1049 (7th Cir. 2000).

[106] *See* 11 U.S.C. § 105(a).

[107] *In re Paige,* 365 B.R. 632, 637-40 (Bankr. N.D. Tex. 2007); *In re* Brown, 444 B.R. 691, 695 (Bankr. E.D. Tex. 2009); In *re Gorshtein*, 285 B.R. 118, 124 (Bankr. S.D.N.Y. 2002).

[108] *In re Parsley*, 384 B.R. 138, 179 (Bankr. S.D. Tex. 2008); *Gorshtein*, 285 B.R. at 124.

Here, the ultimate question is: was the conduct of the Debtor and/or Debtor's counsel (in amending the Debtor's homestead exemption so very late in this case, and with such surprise, mid-way through a hearing on the validity of the Debtor's claimed exemptions, after pointed questioning by the court as to what the contested facts would be) "bad faith"?  Was it "callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent"?    As mentioned previously, the relevant conduct occurred:  (a) more than 15 months after the case was filed; (b) more than three months after two objections to the Debtor's original homestead exemption were filed; (c) more than two months after the Trustee moved and obtained an order allowing him to try to sell the amended homestead (*i.e.,* the Business Properties—60 Acres) and had expended time and effort evaluating the value of this property (believing it was going to be nonexempt and liquidated by him), employing an auctioneer and real estate broker and conducting an auction on such property (which the Debtor never objected to); and (d) mid-way through a contested hearing for which the parties and court had prepared.

The court concludes yes.  There was bad faith.  There should be some fee shifting. The actions were sufficiently callous and recalcitrant.  The actions were somewhat arbitrary and capricious.  The Debtor's amendment of his homestead exemption, under the facts and circumstances of this Bankruptcy Case, was so unreasonably late that it ultimately caused counsel for the Trustee and Estela (as well as this court) to needlessly prepare for a hearing that should have never gone forward.  While the court understands that positions often change in bankruptcy, the court cannot find that the Debtor and his counsel were acting in good faith in this instance.  This is certainly not a situation where a debtor was having to make a quick decision on what property he was claiming as his homestead in a last second filing, but rather, it appears to this court that the Debtor and/or his counsel (with his authority) made a calculated decision to

assert that the French Properties were his homestead—so long as they could get away with it unchallenged—and only decided to change strategy in the middle of a hearing once it appeared that the Debtor's homestead argument was a losing one. It is worth reiterating that this court repeatedly questioned Debtor's counsel at the beginning of the Original Objection Hearing as to what the disputed fact issues were, since the Debtor's right to assert a homestead exemption in the French Properties appeared to boil down to a legal issue (whether the Debtor could be deemed to have a present possessory interest in the French Properties) and Debtor's counsel seemed to evade the court's questions until finally confirming that the Debtor would testify and argue that he had a present possessory interest in the French Properties. Then, one hour and six minutes into the contested hearing, Debtor's counsel announced that the Debtor was going to change positions and claim that the Business Properties—60 Acres was exempt, only after confronted with relevance objections to her questioning of her Debtor-client. A lawyer has a duty of candor to the court. When asked what was going on, Debtor's attorney asserted attorney-client privilege. Therefore, this court must make inferences, to some extent, regarding who was "calling the shots." The court concludes it has no choice but to hold both Debtor and counsel jointly and severally accountable, if they both choose not to elaborate on why they did not tell opposing counsel and the court sooner that they might or would be changing strategy. Thus, that is what the court will do. The court next must examine how much fee shifting is appropriate, as a sanction.

### 3. Amount of Sanction/Fee Shifting Award.

The Trustee and Estela submitted fee statements that the court has reviewed. As noted earlier, on February 6, 2015, the Trustee filed his Notice of Fees and Expenses Incurred in Relation to Debtor's Original and Amended Exemption, pursuant to the court's Order to Show

Cause, requesting fees and expenses in the amount of $26,647.24, which represented the amounts expended by Trustee's counsel, Holder Law, for services rendered to the bankruptcy estate in relation to the Debtor's original and amended exemptions.[109] On February 9, 2015, the Trustee filed a second Notice of Fees and Expenses Incurred in Relation to Debtor's Original and Amended Exemptions, requesting fees of $25,905.50, which represented the amount expended by the Trustee's accounting firm, LSSM, for services rendered to the bankruptcy estate in relation to the Debtor's original and amended exemptions including valuation analysis.[110] Pursuant to an Amended Supplement to Notice of Fees and Expenses Incurred in Relation to Debtor's Original and Amended Exemptions,[111] Holder Law requested an additional $1,817.50 in fees and LSSM requested an additional $3,680.50 in fees for responding to the Debtor's request for production of documents in relation to each parties original Notice of Fees and Expenses. The Amended Supplement also requested a $400 decrease in the fees asserted by Holder Law as well as a $2,309 decrease in the fees asserted by LSSM. Accordingly, the total fees and expenses requested by Holder Law was **$28,064.74** and the total fees requested by LSSM was **$27,277**, for a total of **$55,341.74** sought by the Trustee. As also noted earlier, on February 9, 2015, Estela, pursuant to the court's Order to Show Cause, also filed a Notice of Fees Incurred in Relation to the Debtor's Change of Exemptions which requested reimbursement of **$5,109.50** of attorney's fees that were billed to Estela by her law firm, Cavazos, Hendricks, Poirot & Smitham, P.C., in connection with preparations for the Original Objection Hearing.[112] Thus, this court must now consider whether it is appropriate to order the Debtor and/or Debtor's

---

[109] *See* DE # 319 in the Bankruptcy Case.

[110] *See* DE # 325 in the Bankruptcy Case.

[111] *See* DE # 351 in the Bankruptcy Case.

[112] *See* DE # 327 in the Bankruptcy Case.

counsel to reimburse approximately $60,000 of fees and expenses incurred by the Trustee and the largest creditor in connection with the bad faith change in strategy.

The court is ordering that the Debtor and his counsel shall be jointly and severally liable to reimburse the full **$5,109.50 incurred by Estela's counsel** and **$25,245 of the amount incurred by the Trustee's counsel (Holder Law Firm) but none of the amount incurred by the Trustee's accountants, LSSM.** The court concludes that these amounts represent reasonable and necessary attorney's fees spent as a result of the Debtor's and counsel's arbitrary, capricious, and recalcitrant bad faith behavior concerning the flip-flop on exemptions. Specifically, the fees related to:  (a) evaluating and attempting to sell the Business Properties—60 Acres (while the Debtor and his counsel lay silent about any possibility of later claiming this property as exempt); (b) preparing for a hearing on the homestead exemption on the French Properties that could have been avoided had the Debtor and his counsel amended the Debtor's homestead exemption in a more timely manner (*i.e.*, not in the middle of a contested hearing); and (c) preparing a revised objection to exemption as to the Business Properties—60 Acres and preparing and submitting fee reimbursement requests for all of this.  In assessing these fees, the court has reduced by $2,640 the amount sought by Holder Law (concluding that it would not be appropriate to award fees or expenses relating to engaging in certain settlement negotiations). Additionally, the court does not believe it is reasonable or appropriate to reimburse any time for *accountants* to the Trustee; the court is not persuaded that genuine accounting services were needed with regard to evaluating the merits or value of the homestead exemptions.

### D.    Was this all "Much Ado About Nothing"?[113]

As was noted early on (in footnote 18 herein), the court has worried, while having this contested matter under advisement, that this may all turn out to be "much ado about nothing." As noted, Estela has made the argument that she has an equitable lien in the French Properties, the Business Properties—60 Acres, and all other Real Property of the Debtor.  This equitable lien was granted by the Navarro County Court to secure the Debtor's indebtedness to her created in the Divorce Decree, and Estella asserts that it is ***superior to any homestead rights that the Debtor could assert in the French Properties.***  This argument was, actually, not very forcefully stressed by the parties (it was given a small amount of attention in the parties' pleadings and was not orally argued extensively).   Presumably, this was due to the fact that the Debtor continues to attack the Divorce Decree through an objection to Estela's proof of claim, an adversary proceeding, and through a state court proceeding (arguing that the Divorce Decree amounted to a fraudulent transfer and that there was also fraud in connection with the Divorce Decree) and, thus, the indebtedness owed to Estela and the equitable lien may be subject to reduction or other modification in the domestic court or other courts.  However, Estela's argument that she has a lien superior to any homestead right of the Debtor would likely prevail, if the Divorce Decree ultimately withstands challenge in the state court system.  Why?  Because a debtor is not able to shield an otherwise exempt homestead from a former spouse who is owed a domestic support obligation (this assumes Estela's indebtedness would be a domestic support obligation). Additionally, a debtor is not able to stop a forced sale to pay a debt of a kind defined in TEX. CONST. art. XVI, §50(a)(3) and TEX. PROP. CODE §41.001(4) (*i.e.,* a debt of one spouse in favor of the other spouse resulting from a division of a family homestead in a divorce proceeding).

---

[113] WILLIAM SHAKESPEARE, MUCH ADO ABOUT NOTHING (1599) (often described as a play combining comedy with serious meditations on honor, shame, and court politics).

Thus, ***this court cannot help but worry that this contested matter and ruling regarding the validity of the Debtor's homestead exemption is "much ado about nothing."***  Stated another way, this contested matter, pertaining to the validity of the Debtor's homestead exemption, may only be relevant to 6.26% of the Debtor's prepetition creditors in this bankruptcy case (*i.e.,* the non-Estela creditors).[114]  This is because Estela may not be precluded from collecting against the Debtor's homestead.  And this 6.26% is likely even further diminished when one considers that ***10 of the 15 proofs of claim*** on file in this Bankruptcy Case were filed by real estate taxing authorities that are not only likely significantly over-secured, but also presumably will care mostly about their *in rem* rights on the property to which their tax claims relate (and likely nothing else).  The relevancy is even further diminished when one observes that yet ***two other of the 15 proofs of claim*** were filed by secured financial institutions who have non-exempt collateral to look to for payment.  Time will tell.

Accordingly, for the reasons set forth above, it is

**ORDERED** that the Amended Objections to Exemptions are **SUSTAINED IN PART AND OVERRULED IN PART** and the Debtor shall only be permitted to claim a homestead exemption in the Business Properties—60 Acres, but ***not*** Parcel 4 of the French Properties (the 141.24 acre tract); and it is further

**ORDERED** that, pursuant to section 105 and the court's inherent sanctioning authority, the Debtor, Gonzalo Saldana, and Debtor's counsel, Rosa Orenstein, shall reimburse Estela Saldana and her counsel **$5,109.50** in reasonable attorney's fees and the Trustee, John Litzler,

---

[114] As noted early on, there were fifteen proofs of claim filed in the Debtor's case:  (a) ten of which were filed by property taxing authorities; (b) one of which was Estela's; (c) two filed by financial institutions; (d) one relating to a credit card; and (e) one by a utility.  The total dollar amount of the proofs of claim filed was $2,721,831.68, and Estela's claim was $2,551,568.41 of this amount.  Thus, there are $170,263.20 of "other" prepetition creditors in the Debtor's case, besides Estela.  Restated, Estela asserts 93.74% of the prepetition claims in this case and the other creditors assert 6.26% of the prepetition claims.

and his counsel **$25,245** in reasonable attorney's fees within fifteen (15) days of the entry of this

Order.[115]

### ### END OF MEMORANDUM OPINION AND ORDER ###

---

[115] The responsibility of the Debtor and Debtor's counsel for these amounts is joint and several, and is enforceable through the normal procedures for collecting money judgments.